UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

                 :

**RONALD MAURICE GIDDENS**,         :

               Petitioner,    :

                 :    **MEMORANDUM DECISION AND ORDER**

     – against –          :

                :    19-CV-6224 (AMD)

**STATE OF NEW YORK**,           :

                 :

             Respondent.    :

------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The *pro se* petitioner, currently incarcerated at Green Haven Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  A jury convicted the petitioner of felony murder, manslaughter, burglary, criminal possession of a weapon, and two counts of criminal possession of stolen property.  He was sentenced to an indeterminate prison term totaling thirty-six years to life.  The petitioner argues that the prosecution did not prove his guilt beyond a reasonable doubt, that the trial court should have instructed the jury on the defense of justification, that the prosecutor's remarks in summation were unfairly prejudicial and that his sentence is excessive in violation of the Eighth Amendment.  (ECF No. 1 at 39–52.)  For the reasons that follow, the petition is denied.

## BACKGROUND

On December 1, 2013, the petitioner attacked Tony Walker when Mr. Walker was leaving his apartment, punching him in the face.  (ECF No. 16 at 4.)  The petitioner then dragged Mr. Walker back inside and kicked and stomped on his head.  (*Id.*)  As Mr. Walker lay bleeding on the floor, the petitioner searched the apartment until he found Mr. Walker's gun and phone.  (*Id.*)  He used the phone to call Patricia Tony and told her that Mr. Walker needed an ambulance.

(*Id.*)  Then he pocketed the gun and the phone and left.  Mr. Walker never regained

consciousness and was declared brain dead later that day.  (*Id.*)

The petitioner was charged with second degree murder, N.Y. Penal Law § 125.25[3]

(felony murder), first degree manslaughter, *id.* § 125.20[1], first degree burglary, *id.* § 140.30[2],

second degree criminal possession of a weapon, *id.* § 265.03[3], second degree burglary, *id.* §

140.25[1], second degree assault, *id.* § 120.05[1], fourth degree criminal possession of stolen

property, *id.* § 165.45[4], and fifth degree criminal possession of stolen property, *id.* § 165.40.[1]

## I.   Trial

The petitioner went to trial before the Honorable Kenneth Holder and a jury in Queens

County Supreme Court.[2]

### A.  The Prosecution's Case

The prosecution called nine witnesses: Patricia Tony; emergency medical technician Jose

Solis; building superintendent Michael Pastrikos; Officer Joseph Rojas; Detectives Rashida

Jupiter, John Bellico and Colleen Schutt; criminalist Michael Coffey; and medical examiner Dr.

Sean Kelly.  Their testimony established the following facts.

Patricia Tony met the petitioner in August 2013 at a bus stop.  (Trial Transcript, ECF

Nos. 16-3, 16-4, 16-5, 16-6, 16-7 ("T. Tr.") at 522.)  Ms. Tony, "a lesbian," had no interest in a

romantic relationship with the petitioner but thought he was a "cool guy," and the two became

close friends.  (T. Tr. 523.)  They worked out together, shared meals and watched television at

Ms. Tony's apartment.  (T. Tr. 523–25.)  The petitioner also spent the night at Ms. Tony's

---

[1]  The indictment also charged the petitioner with second degree burglary and assault; the court dismissed
those counts before the case went to the jury.  (Trial Transcript, ECF No. 16-6 at 906, ECF No. 16-7 at
988.)

[2]  Before the trial, the petitioner moved to suppress his post-arrest statements.  The Honorable Steven
Paynter denied the motion after a hearing.  (Hearing Transcript, ECF No. 16-3 at 58–64.)

apartment whenever he fought with his brother.  (T. Tr. 525.)  In the beginning of November, however, the petitioner cut off all contact with Ms. Tony.  (T. Tr. 526–27, 533–34.)

Ms. Tony began spending time with Tony Walker, who lived in her building.  (T. Tr. 528.)  Mr. Walker often watched television and ate dinner in Ms. Tony's apartment.  (T. Tr. 528–33.)  On November 29, 2013, while Mr. Walker was eating Thanksgiving dinner in Ms. Tony's room, the petitioner knocked on the door.  (T. Tr. 534–35.)  Ms. Tony was surprised, because she had not seen or heard from him for several weeks.  (T. Tr. 535–36.)  Ms. Tony feared that the petitioner would be angry if he saw Mr. Walker, so she spoke with the petitioner in the hall.  (*Id*.)  After a few minutes, however, the petitioner asked to use the bathroom, so Ms. Tony let him in.  (T. Tr. 536.)  The petitioner told Mr. Walker, in "a gangster voice," that he had "10 minutes to get the F out of here."  (T. Tr. 536–37.)  Ms. Tony told the petitioner that he could not talk to her friend that way and asked him to leave.  (T. Tr. 537.)  The petitioner was angry and asked Ms. Tony why she had "this guy up in the house" when she "knew that [the petitioner] was coming."  (T. Tr. 538.)   He said that he was "gone for so long" to "try and make money" for the both of them.  (*Id*.)  Ms. Tony managed to defuse the situation by telling the petitioner that she had to get up early for work the next day.  (T. Tr. 537.)  The petitioner agreed to leave but told her that he would be back soon, and that Mr. Walker had better not be in her apartment.  (T. Tr. 537, 539.)

Mr. Walker and Ms. Tony were in her apartment the next morning when the petitioner showed up again, with breakfast and a bottle of Hennessy.  (T. Tr. 540.)  The petitioner demanded to know why he was "always running into" Mr. Walker at Ms. Tony's apartment.  (T. Tr. 542.)  Ms. Tony wanted to avoid a confrontation, and asked Mr. Walker to leave.  After Mr. Walker left, she told the petitioner that she needed to get ready for work and would call him later.  (T. Tr. 544.)  The petitioner left but repeatedly texted and called Ms. Tony and asked to

meet her after work.  (T. Tr. 544, 546.)  Ms. Tony did not want to see the petitioner but did not

want to tell him so directly, so she told him to meet her at the bus station.  (T. Tr. 547.)  Ms.

Tony also texted Mr. Walker that the petitioner was "pressuring" her to meet him, and Mr.

Walker replied that he would meet her at the bus station.  (T. Tr. 548.)

When Ms. Tony got off the bus, the petitioner was waiting across the street, and Mr.

Walker was walking towards her.  (T. Tr. 550–51.)  He put his arm around Ms. Tony and told the

petitioner to "move away" and that Ms. Tony was Mr. Walker's "woman."  (T. Tr. 551.)  The

petitioner screamed that Ms. Tony should not "choose this little guy over me" and took off his

backpack "as if he was going to hit" Mr. Walker.  (T. Tr. 552–54.)  At that point, Mr. Walker

pulled up his shirt.  (T. Tr. 554.)  Ms. Tony did not see if Mr. Walker had anything in his waist,

but the petitioner "moved back and . . . said oh yeah it's like that."  (T. Tr. 554–55.)  As the

petitioner grabbed his bag and started to leave, he warned that he was "coming back for" Mr.

Walker.  (T. Tr. 555.)  Mr. Walker and Ms. Tony went to her apartment.  (T. Tr. 556.)  Mr.

Walker spent the night there, because he was "shaken up."  (*Id.*)

The next morning, after Mr. Walker left for the grocery store, Ms. Tony heard a knock at

the door.  (T. Tr. 557–58.)  Thinking Mr. Walker had forgotten something, she opened the door,

and saw the petitioner.  (T. Tr. 558.)  He pushed her inside and started throwing her things

around, demanding the gun that Mr. Walker "flash[ed]" at him the night before.  (T. Tr. 558–59.)

He left after about three minutes.  (T. Tr. 560.)[3]  Approximately fifteen minutes later, the

petitioner called her from Mr. Walker's phone.  (T. Tr. 561–62.)  The petitioner said that he

"beat [her] boy up," "just eff'd [him] up," and that she "better call the ambulance because [Mr.

---

[3] Building surveillance videos showed that the petitioner was waiting outside Ms. Tony's apartment.  He
put on gloves and went in and out of the neighbor's apartment, listening at Ms. Tony's door and looking
under the door.  (T. Tr. 587–88.)

Walker] is choking on some blood."  (T. Tr. 562–63.)  Ms. Tony thought that the petitioner was

lying and that he took Mr. Walker's phone when he was at her apartment.  (T. Tr. 563–64.)  But

shortly thereafter, the petitioner knocked on her door.  (T. Tr. 564.)  He was "scratched up," and

repeated that he "messed up [her] boy" and that she should call an ambulance.  (T. Tr. 564–65.)

When Mr. Walker still had not come back from the store, Ms. Tony went to check on

him.  (T. Tr. 567.)  His door was closed but unlocked.  (*Id*.)  Ms. Tony pushed it open and saw

Mr. Walker lying on the floor face up "literally choking on his blood."  (*Id*.)  "If it wasn't [for]

the clothes that he had on" earlier that day, Ms. Tony would not have "recognize[d] him at all."

(T. Tr. 569.)  "[H]is face was swelled up, his eyes w[ere] shut closed and puffy," and his "mouth

was swollen."  (*Id*.)  It looked "like the corner of the drawer was dented in his forehead."  (*Id*.)

The apartment was "thrown apart;" "his dresser drawers w[ere] thrown to the side, everything

was just messy, everything was just thrown around."  (T. Tr. 568.)  Ms. Tony called 9-1-1.  (T.

Tr. 569.)

Officers Rojas and Marecki arrived first, and Ms. Tony led them to Mr. Walker's

apartment.  (T. Tr. 656–59.)  The officers tried to speak with Mr. Walker, but he did not respond.

(T. Tr. 660.)  Emergency medical technicians arrived about ten minutes later and took Mr.

Walker to the hospital, where he was taken into surgery.  (T. Tr. 661–63.)  Meanwhile,

Detectives Bellico and Lopez arrived at Mr. Walker's apartment, spoke with Ms. Tony and

investigated the crime scene.  (T. Tr. 787–90.)  After about 45 minutes, they drove to the

hospital, where the doctors told them that Mr. Walker's surgery had been unsuccessful and that

he was brain dead.  (T. Tr. 848.)

The petitioner texted Ms. Tony throughout the day, and asked her to meet him.  (T. Tr.

572–73.)  Ms. Tony shared the texts with Detective Bellico and other officers, and arranged to

meet the petitioner.  (T. Tr. 573–74, 795–96.)  Detectives accompanied her, and arrested the

petitioner at 12:45 a.m.  (T. Tr. 798–99.)  The petitioner had Mr. Walker's gun and cell phone in

his pockets.  (T. Tr. 799–801.)

 As they drove to the precinct, the petitioner asked why the police arrested him.  Detective

Bellico replied they were arresting him for assault.  (T. Tr. 802.)  The petitioner volunteered that

he had been in "a fight" earlier that day, that he "saved [the other] guy," and that he "should have

hit him harder so that he would not have remembered" the petitioner.  (T. Tr. 803.)  After they

arrived at the precinct, Detective Lopez advised the petitioner of his constitutional rights; the

petitioner confirmed that he understood his rights but did not want to talk to the police.  (T. Tr.

804–05, 809.)  The officers left the petitioner in the interview room for the night.  (T. Tr. 810.)

 The next day, at around 1:00 p.m., Detective Bellico advised the petitioner of his rights a

second time; the petitioner again confirmed that he understood his rights and agreed to speak.

(T. Tr. 824–28.)  Detective Bellico asked the petitioner to write a statement, but the petitioner

explained that "he wasn't good at writing," so Detective Bellico wrote down the petitioner's

statement, word for word:

> Me and Pat have been talking for one month, but I haven't seen her for two weeks.
> On Sunday I went to Pat['s] house, and there was a man there with her.  I told the
> guy, "Don't be here when I get back."  On Saturday night Pat and I went up at the
> train station on 116 Street, and the guy showed up and flashed the gun at me.
> Sunday morning at the house I saw the guy and hit him one time, and then I took
> the gun off the bed and left. . . . I told her to call the ambulance so he would not
> die.  He was bleeding bad, and I turned him over.

(T. Tr. 828, 833–34.)  The petitioner also admitted that he took Mr. Walker's phone.  (T. Tr.

834.)  The petitioner then signed the statement.  (*Id*.)

 About two hours later, at 3:00 p.m., Detective Bellico interviewed the petitioner again,

and wrote down his responses.  (T. Tr. 835–36.)  The petitioner explained that another tenant let

him into the building and that he waited "at someone else's apartment" for Mr. Walker to leave

Ms. Tony's apartment.  (T. Tr. 838–39.)  He then followed Mr. Walker and waited outside his

apartment; when Mr. Walker came out, the petitioner "hit him once."  (T. Tr. 839.)  The

petitioner added that when he "go[es] on missions like that," he is "sober, never high."  (T. Tr.

838.)  The petitioner signed this statement as well.  (T. Tr. 839.)

At about 5:00 p.m. that same day, the petitioner agreed to make a videotaped statement to

an assistant district attorney.  (T. Tr. 840–41.)  After waiving his rights, the petitioner explained

that he knew Ms. Tony for about a month and that they had discussed moving in together.  (ECF

No. 1 at 24.)  He had not spoken to her for a few weeks because he was going through some

"emotional difficulties." (*Id.*)  When he went to her apartment on November 29th, he found Mr.

Walker lying in Ms. Tony's bed, naked.  (*Id.*; *see also* T. Tr. 895.)  He went to meet Ms. Tony

the next night, but Mr. Walker showed up "out of nowhere," told the petitioner that Ms. Tony did

not want to see him and "flash[ed]" his gun.  (ECF No. 1 at 24; *see also* T. Tr. 901–03.)  The

petitioner was angry; he "felt disrespected" and that his honor had been attacked.  (T. Tr. 937–

38.)  He decided that Mr. Walker should "get it" because he pulled a gun on someone he did not

know.  (ECF No. 1 at 24–25; T. Tr. 938.)  The petitioner stayed up thinking all night and decided

to "make [Mr. Walker] an example."  (ECF No. 1 at 24; T. Tr. 935–37.)  The next day, he went

to Ms. Tony's apartment, assuming Mr. Walker would be there.  (ECF No. 1 at 25.)  When Mr.

Walker came out, the petitioner followed him to his apartment.  (*Id.*; *see also* T. Tr. 913.)  The

petitioner "didn't wait," and "was on" Mr. Walker "like a pit bull on red meat."  (ECF No. 1 at

25; T. Tr. 944.)  He knocked Mr. Walker out with a single punch to the chin, and Mr. Walker fell

on his bed and then on the floor.  (ECF No. 1 at 25; T. Tr. 948.)

The officers showed the petitioner a photograph of Mr. Walker in the hospital.  He said

that Mr. Walker "brought the situation on himself," because "you don't run nobody," and

because the petitioner had been with Ms. Tony first.  (ECF No. 1 at 25; T. Tr. 954.)  The petitioner admitted that he found the gun not on the bed, as he said before, but under Mr. Walker's mattress.  (ECF No. 1 at 25; *see also* T. Tr. 963.)

Dr. Kelly from the Medical Examiner's office performed the autopsy on Mr. Walker. Mr. Walker's injuries were consistent with being punched and kicked at least eight separate times, and possibly many more.  (T. Tr. 751–53.)  The cause of death was blunt force injuries to Mr. Walker's head.  (T. Tr. 748.)

Analysts tested the petitioner's clothes.  Mr. Walker's blood was on the bottom of the petitioner's pants and on the top of his shoes.  (T. Tr. 843–845, 847.)  Because Mr. Walker's blood was not on the floor, the blood on the petitioner's shoes and pants suggested that the petitioner kicked Mr. Walker in the face.  (T. Tr. 491–93, 508–09, 661, 690.)

### B.  The Defense's Case

The petitioner was the only defense witness.  He explained that he came to Ms. Tony's apartment on November 29, 2013, to discuss moving in together.  (T. Tr. 897–98.)  He told Mr. Walker to leave, but only because he wanted to speak with Ms. Tony privately about an apartment.  (T. Tr. 895.)  The petitioner and Ms. Tony agreed to meet the next day, but Mr. Walker also arrived, and put his arm around Ms. Tony possessively.  (T. Tr. 902.)  He told the petitioner, "[S]he don't have to talk to you.  That's my girl.  You got nothing to do with her.  I don't want her talking to [you]."  (*Id.*)  The petitioner tried to talk to Ms. Tony, but Mr. Walker continued to answer for her, and moved closer to the petitioner.  (T. Tr. 903.)  The petitioner was worried about Ms. Tony, and asked, "Does he own you?  Does he control you?"  (*Id.*)  At that point, Mr. Walker "pull[ed] up his shirt," and the petitioner saw a gun in Mr. Walker's waistband.  (*Id.*)

The petitioner wanted to talk to Mr. Walker, so he went to Ms. Tony's building the next day.  He "wasn't looking for no unnecessary conflict, but . . . wanted to know what was going on because if this dude was going to continue to be in her life, I didn't want him in mine."  (T. Tr. 912.)  Mr. Walker opened the door and reached for his waist, as he had done the previous night.  (Tr. 916–17.)  The petitioner was "permanently scarred" from the night before, and "had no choice but to defend [himself] because [he] didn't want to get shot."  (*Id*.)  The petitioner punched Mr. Walker twice, using a one-two "combination."  (T. Tr. 917–18.)  Mr. Walker fell on the floor, "dazed."  (T. Tr. 918.)

The petitioner searched Mr. Walker's apartment and found a gun under the mattress.  (T. Tr. 919.)  The petitioner took the gun for safety reasons, because Mr. Walker was a dangerous person who should not own a gun.  (T. Tr. 919.)  The petitioner planned to give the gun to "Larry," a long-time friend and former police officer, but did not have an opportunity to speak with him before his arrest.  (T. Tr. 921–22.)  The petitioner took Mr. Walker's phone, because he did not want Mr. Walker to call the police.  (T. Tr. 919.)

### C.  Trial Motions

At the close of the prosecution's case, defense counsel argued that "there [was] not legally sufficient evidence to make out the charges," and moved to dismiss.  (T. Tr. 906.)  Judge Holder denied the motion, finding "no basis to dismiss."  (T. Tr. 907.)

Counsel renewed the motion at the end of the defense case.  He argued that the prosecution had not proven burglary, and thus not felony murder, because the petitioner "was clearly licensed and privileged to be in the common area of the building," and "did not enter or remain unlawfully inside the location when the fight occurred."  (T. Tr. 988.)  Nor, according to counsel, could burglary be predicated on the taking of the gun and phone, "because he intended

9

to return" those items.  (*Id.*)  Judge Holder denied the motion, pointing out that the petitioner

"had several opportunities" to confront Mr. Walker in public but chose instead to "follow . . .

Walker downstairs to his apartment and wait until he gets inside."  (T. Tr. 989–90.)  In addition,

the court noted the petitioner's admission that he went to Mr. Walker's apartment to "to find the

gun."  (*Id*.)  Under these circumstances, the jury could "easily infer" that the petitioner had "an

intent to commit a crime" inside Mr. Walker's apartment, whether it was to assault Mr. Walker

or to take his gun.  (T. Tr. 989–90.)

Judge Holder also concluded that the "People have certainly made out evidence that a

jury may infer" that the petitioner caused Mr. Walker's death during or in furtherance of the

burglary and that the petitioner intended to kill or at least seriously injure Mr. Walker, even if the

petitioner claimed that he "only intended to just really protect himself."  (T. Tr. 990.)

During the charge conference, counsel asked the court to instruct the jury on the defense

of justification.  The court declined, explaining it did "not see how any reasonable view of the

evidence of this case could justify the granting of the defense of justification under the facts

here," because the petitioner followed Mr. Walker to his apartment and hit him twice before Mr.

Walker had a chance to do or say anything, and the petitioner could not "get the benefit of the

defense of justification when [he] set everything in motion."  (T. Tr. 994–96.)[4]

### D.  Verdict and Sentencing

The jury found the petitioner guilty on all counts.  (T. Tr. 1116.)  The court sentenced

him as a persistent violent felony offender to a total of thirty-six years to life in prison:

---

[4]  In New York, a person may "use physical force upon another person when and to the extent he or she
reasonably believes such to be necessary to defend himself, herself or a third person from what he or she
reasonably believes to be the use or imminent use of unlawful physical force by such other person,
unless: (a) [t]he latter's conduct was provoked by the actor with intent to cause physical injury to
another person; or (b) [t]he actor was the initial aggressor . . . ."  N.Y. Penal Law § 35.15(1).

concurrent terms of twenty years to life for second degree murder, first degree manslaughter and first degree burglary, and a consecutive term of sixteen years to life on the second degree weapon count.  (Sentencing Transcript, ECF No. 16-7 ("S. Tr.") at 12–13.)[5]

## II.   Appeal

The petitioner appealed his conviction to the Appellate Division, Second Department, and raised four claims.  First, he argued that the prosecution did not prove his guilt of murder, manslaughter or burglary beyond a reasonable doubt, because the prosecution did not disprove his claims that he hit Walker in self-defense and entered Walker's apartment only "incidental[ly] to his response to Walker's deadly threat."  (ECF No. 1 at 41.)  Alternatively, he urged that the conviction on those three counts was "against the weight of the evidence."  (*Id.* at 39.)  Second, the petitioner claimed that the trial court's refusal to instruct the jury on the defense of justification denied him due process and a fair trial.  (*Id.* at 42–44.)  Third, he argued that the prosecution's comments in summation denied him due process and a fair trial.  (*Id.* at 45–51.) Finally, he argued that his sentence was excessive, and amounted to a life sentence without the possibility of parole.  (*Id.* at 52.)

The Second Department rejected the petitioner's arguments about the sufficiency of the evidence and the prosecutor's summation as unpreserved, and in any events meritless.  (ECF No. 16-1 at 105–06.)  The court was "satisfied that the verdict of guilt on these counts was not against the weight of the evidence."  (*Id.* at 106.)  The court also concluded that the "prosecutor's comments [in summation] were either fair comment on the evidence and the reasonable inferences to be drawn therefrom or responsive to defense counsel's summation, or otherwise did not deprive the defendant of a fair trial."  (*Id.*)  The court rejected the petitioner's claim that the

---

[5] The court also imposed concurrent terms of two to four years for fourth degree criminal possession of stolen property and one year for the stolen property conviction.  (S. Tr. 12–13.)

trial court should have instructed the jury on the defense of justification since, "viewing the record in the light most favorable to the defendant, no reasonable view of the evidence supported such a charge."  (*Id.*)  The court cited New York cases discussing the application of the justification statute.  (*Id.* (citing *People v. Watts*, 57 N.Y.2d 299, 301–02 (1982); *People v. Syville*, 130 A.D.3d 658, 658 (2d Dep't 2015); *People v. Cotsifas*, 100 A.D.3d 1015, 1015 (2d Dep't 2012); *People v. Small*, 80 A.D.3d 786, 787 (2d Dep't 2011).)  Finally, the court ruled that the "sentence imposed was not excessive."  (*Id.*)

The New York Court of Appeals denied the petitioner's application for leave to appeal on September 17, 2018.  (ECF No. 16-2 at 3.)

### III.     Habeas Petition

The petitioner filed this petition on November 4, 2019.  Two pages of his form petition are missing, but because in the rest of the petition, the petitioner raises the same claims he raised on appeal to the Second Department, and attaches the appellate brief, I assume that he means to raise all of those challenges: legal insufficiency of the evidence, refusal to instruct the jury on the defense of justification, prejudicial statements in summation and excessive sentence.[6]

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act ("AEDPA") limits the authority of federal courts to grant writs of habeas corpus to state prisoners.  Section 2254(a) permits a federal court to entertain only those applications claiming violations "of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Sections 2254(b) and (c) prevent a federal court from granting the writ if the applicant has not exhausted state remedies.

---

[6]  The petitioner did not respond to the Court's inquiries about the missing pages, or whether the Court was correct to assume that he meant to raise all of his appellate claims.  (*See* ECF entries dated October 5, 2020, January 29, 2021, July 26, 2022, and December 19, 2022.)

Even when issues are properly before a federal court, AEDPA's standards are "difficult to meet," because the Act sets up a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted). Accordingly, a federal court may not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This bar applies to substantive and procedural state law grounds alike. *Id*. at 729–30.

As for claims that have been "adjudicated on the merits in State court proceedings," a federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C. § 2254(d)). Federal court review "is limited to the record that was before the state court that adjudicated the claim on the merits," and the petitioner carries the burden of proof. *Id.* at 180–81.

## DISCUSSION

The petitioner advances five arguments: the evidence against him was legally insufficient on the murder, burglary and manslaughter counts; the verdicts were against the weight of the evidence; the trial judge should have instructed the jury on the defense of justification; the prosecutor's comments in summation deprived the petitioner of a fair trial; and his sentence was excessive and violated the Eighth Amendment. I address each argument in turn.

## I.      Sufficiency of the Evidence

The petitioner argues that the evidence of murder, manslaughter and burglary was legally insufficient, and his conviction thus "violated due process."  (ECF No. 1 at 39.)  With respect to manslaughter, the petitioner contends that the prosecution failed to disprove justification beyond a reasonable doubt.  *See* N.Y. Penal Law §§ 25.00, 35.00 (explaining that justification is an ordinary, not an affirmative, defense that the government must disprove); *In re Y.K.*, 87 N.Y.2d 430, 433 (1996) (same).  As for burglary, the petitioner explains that he was licensed and privileged to enter the common areas of the building, including the hallway in front of Mr. Walker's apartment; he claims that he went into Mr. Walker's apartment only after he punched him, to pull Mr. Walker inside, so the entry was "merely incidental to his response to Walker's deadly threat" and thus not a burglary.  (ECF No. 1 at 41.)  And because there was no burglary, the petitioner argues, he was not guilty of felony murder.

The Second Department found the petitioner's challenge to the legal sufficiency of the evidence "unpreserved for appellate review," and in any event, meritless.  (ECF No. 16-1 at 105–06 (citations omitted).)  Giving the petitioner the benefit of the doubt, I conclude that defense counsel preserved his arguments about the sufficiency of the evidence.  Nevertheless, I reject his claims on the merits.

In reviewing the legal sufficiency of the evidence, a federal court does not ask "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted).  Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (citation omitted).  The evidence in this case easily meets that standard.

In New York, a person commits burglary in the first degree when he "knowingly enters unlawfully in a dwelling with the intent to commit a crime therein" and, "in effecting entry or while in the dwelling or the immediate flight therefrom," physically injures another. (T. Tr. 1074–75.) A person is guilty of felony murder when he "causes the death of another" "in the course of and in furtherance of the commission of a burglary or the immediate flight therefrom." (T. Tr. 1070.)

The evidence proved convincingly that the petitioner killed Mr. Walker out of anger and jealousy. He was angry that Ms. Tony was spending time with Mr. Walker, and told her that she "was disrespecting him [by] having" Mr. Walker in her apartment. (T. Tr. 538.) He also felt "disrespected" when Mr. Walker showed up to meet Ms. Tony at the bus station. (T. Tr. 938.) Indeed, he "wanted to fight" then and there, but had to back off when Mr. Walker flashed a gun. (T. Tr. 553.) Mr. Walker's weapon did not deter the petitioner; it made him angrier: "You don't flash a gun at someone when you don't know who they are, what their background is." (T. Tr. 938.) The petitioner "marina[t]ed on" the situation all night, and made it his "mission[]" to confront Mr. Walker. (T. Tr. 838, 960.) He went to Ms. Tony's building, and put on gloves "just in case" he had to fight. (T. Tr. 914.) "Because if I hit a person too much the knuckles turn to pu[tt]y," the petitioner explained. (T. Tr. 981.) The petitioner lurked outside Mr. Walker's apartment "to make sure that [he] caught [Mr. Walker] a little off guard." (T. Tr. 916.) "[A]s soon as [Mr. Walker] opened the door," the petitioner attacked him. (T. Tr. 916–17.) He punched him, then dragged him into the apartment where he kicked and stomped him to death.[7]

---

[7] Under these circumstances, it does not matter that the petitioner might have thrown the first punch in the hallway. In any event, the petitioner admitted that he was "inside [Mr. Walker's] apartment" before he threw the first punch; he "stepped in to hit him." (T. Tr. 968–70; *see also* T. Tr. 838 (conceding that, after Mr. Walker "came out of his room," he "push[ed] him inside").)

In addition to establishing that the petitioner entered the apartment with the intent to assault Mr. Walker, the evidence also proved that the petitioner entered the apartment with the intent to steal Mr. Walker's gun.  The petitioner said as much.  He was "very interested" in getting the gun, because he felt "threatened" and "disrespected."  (T. Tr. 934, 938, 962.)  Indeed, before he attacked Mr. Walker, he pushed his way into Ms. Tony's apartment in an effort to find the gun.  (T. Tr. 558–60, 915 (testifying that "the minute" the petitioner walked into her room, he "started throwing things" and asking about the gun).)  And after beating Mr. Walker, he spent about "seven, eight minutes" in his apartment, throwing open the drawers and flipping the mattress.  (T. Tr. 490, 790, 921.)  He left only when he found the gun.

The evidence also proved the elements of manslaughter in the first degree, which required proof that the petitioner acted with "intent to cause serious physical injury to" Mr. Walker and "cause[d]" Mr. Walker's death.  (T. Tr. 1073.)  The petitioner jumped Mr. Walker, dragged him into his own apartment, and kicked and stomped him so viciously that Ms. Tony only recognized him because of his clothing.  "His face was sw[ollen], his eyes [were] shut closed and puffy.  His mouth was swollen, his nose—it was like the corner of the drawer was dented in his forehead."  (T. Tr. 569.)  Mr. Walker did not respond when emergency medical technicians tried to speak to him and he could not breathe without a ventilation bag.  (T. Tr. 443–46.)  Dr. Kelly, the medical examiner, found at least eight distinct clusters of injuries on the victim's face: both eyes, the crease of the nose, the bridge of the nose, forehead, left cheek, chin and jaw, lips and ears.  (T. Tr. 723–25, 750–51.)  There were additional injuries to Mr. Walker's arm, finger, shin and ankle.  (T. Tr. 749.)  Dr. Kelly concluded that Mr. Walker died because of

"blunt force injuries of the head," and that his injuries were inconsistent with being punched just once or twice.  (T. Tr. 748, 752–53.)[8]

In short, the evidence was sufficient to convict the petitioner on all counts.

## II.   Justification Instruction

As relevant here, New York law provides that a person may "use physical force upon another person when . . . he . . . reasonably believes such to be necessary to defend himself . . . from what he . . . reasonably believes to be the use or imminent use of unlawful physical force by such other person."  N.Y. Penal Law § 35.15(1).  The defense of justification is not available, however, if the person "was the initial aggressor," used force beyond what was necessary to stop the threat or had the opportunity to, but did not, retreat.  *Id.* § 35.15(1)(b), (2)(a).

The petitioner argues that he was entitled to this charge, because Mr. Walker showed him a gun the night before the murder, and appeared to reach for his waist when the petitioner confronted him the next day.  The Second Department concluded that this claim was "preserved for appellate review," but found that "no reasonable view of the evidence supported such a charge."  (ECF No. 16-1 at 106.)  This decision—on a matter of purely state law—is not subject to habeas review.  *See* 28 U.S.C. § 2254(a) (permitting federal courts to grant habeas applications only on violations "of the Constitution or laws or treaties of the United States").  To

---

[8]  In addition to the legal-sufficiency claim, the petitioner also suggests the guilty verdicts were "against the weight of the evidence."  (ECF No. 1 at 5, 39.)  Unlike the legal sufficiency claim, which is based on federal due process principles, a weight of the evidence argument is grounded in state law, N.Y. Crim. P. § 470.15(5).  *Compare Jackson*, 443 U.S. at 318–19 (Fourteenth Amendment requires record evidence to reasonably support a finding of guilt beyond a reasonable doubt), *with People v. Bleakley*, 69 N.Y.2d 490, 495 (1987) (weight of the evidence is based on the court's factual review power).  Accordingly, this Court has no authority to review such a claim.  *See* 28 U.S.C. § 2254(a) (federal habeas corpus review available only where the petitioner has alleged a violation of "the Constitution or laws or treaties of the United States"); *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) (declining to review a weight of the evidence claim).  In any event, the petitioner advances no separate argument on this ground.

make out a claim under § 2254, a petitioner must show that the trial court's error "so infected the entire trial that the resulting conviction violates due process." *Davis v. Strack*, 270 F.3d 111, 131 (2d Cir. 2001) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

The petitioner cannot meet this standard.  The evidence established that the petitioner attacked Mr. Walker when Mr. Walker was not threatening the petitioner with force—deadly or otherwise.  On the contrary, the petitioner laid in wait for Mr. Walker outside Mr. Walker's apartment, jumped him and then beat him to death.  As the petitioner said, "[a]s soon as [Mr. Walker] opened that door," the petitioner "was on him like a pit bull on red meat."  (T. Tr. 944.) Thus, the petitioner was unquestionably the initial aggressor, which forecloses the defense of justification, even accepting his claim, made for the first time at trial, that Mr. Walker appeared to reach for his waistband.[9]

Moreover, the ferocity with which the petitioner attacked Mr. Walker far exceeded what would have been necessary to eliminate a threat of force, even if one existed.  As the petitioner admitted, Mr. Walker "went down on the floor" "[a]s soon as [the petitioner] hit him," and Mr. Walker "did not have a chance" to "fight back."  (T. Tr. 956–57.)  At that point, instead of simply walking away, the petitioner "pulled" Mr. Walker in and "close[d] the door."  (T. Tr. 970.)  The petitioner kicked and punched Mr. Walker in the head—at least seven more times— until his face was unrecognizable.  (T. Tr. 752–53.)  Even viewing the evidence in the light most favorable to the petitioner, *People v. Sanchez*, 31 N.Y.3d 949, 950 (2018), the trial court's decision not to instruct the jury on the defense of justification was not error.[10]

---

[9]  The petitioner did not claim in any of his statements to detectives that Mr. Walker reached for his waistband.  (T. Tr. 946–47.)

[10]  The New York cases the petitioner cites do not compel a different result.  In *People v. Goetz*, the issue was whether a defendant's use of deadly physical force should be evaluated by an objective standard. 68 N.Y.2d 96, 107 (1986).  In *People v. Cox*, the Court of Appeals affirmed the trial judge's decision

### III.     The Prosecution's Summation

The petitioner challenges the following comments in the prosecutor's summation: (1) that the petitioner "made up" his self-defense argument while "prepar[ing] for litigation" (T. Tr. 1028–29); (2) that the petitioner is "an interested witness" who will "say what he has to say" (T. Tr. 1050–51); (3) that the petitioner's testimony that Mr. Walker reached for his waist was "ludicrous and ridiculous and made up and insulting to [the jury's] intelligence" (T. Tr. 1029–30); (4) that the petitioner tailored his trial testimony after listening to the prosecution's evidence (T. Tr. 1031); (5) that the petitioner "had no explanation for why his shoes . . . and pants were full of blood" (T. Tr. 1039); (6) that the case was "simple" and "straight-forward" (T. Tr. 1051); and (7) that "Walker's own voice was silenced forever by this defendant, so you need to speak for him now" (T. Tr. 1052).

Pursuant to New York's "contemporaneous objection rule," a general objection to summation (or otherwise) "is not sufficient" to preserve a claim for appeal. *Downs v. Lape*, 657 F.3d 97, 103 (2d Cir. 2011) (discussing N.Y. Crim. Proc. L. § 470.05(2)). A defendant preserves his claim for appellate review only when he names "the specific error" the prosecution committed, *id.* at 104, so that the trial court has an opportunity to consider a concrete legal error "at the time of [its] ruling," N.Y. Crim. Proc. L. § 470.05(2). This rule ensures that "parties draw the trial court's attention to any potential error while there is still an opportunity to address it,"

---

not to charge justification, because "[a] substantial period elapsed between the time [the victim] forced his way into the [defendant's] apartment and the time defendant fired his weapon." 92 N.Y.2d 1002, 1005 (1998); *see also People v. Watts*, 57 N.Y.2d 299, 302 (1982) (the defendant's single statement that "the complainant came after defendant . . . with a kitchen knife" "provide[d] no basis for determining [that the] defendant reasonably believed that he was in imminent danger" (cleaned up)). And the facts of *People v. Minaya*, where a justification charge was appropriate, bear no resemblance to the facts here. 6 A.D.3d 728, 730 (2d Dep't 2004) (a reasonable view of the evidence supported the theory that the defendant used his car to fend off attackers who jumped on top of the car, denting the hood and crushing the front and back windshields).

and prevents "those who fail to do so from 'sandbagging' the opposing party and the trial court on appeal." *Whitley v. Ercole*, 642 F.3d 278, 288 (2d Cir. 2011) (citations omitted).

Defense counsel registered only general objections to most of the challenged comments, or did not object at all. (*See* T. Tr. 1028–29, 1031, 1039, 1051.) Accordingly, the Second Department found the petitioner's summation claims "largely unpreserved for appellate review."[11] (ECF No. 16-1 at 106.) Because the Second Department's decision was based on a "state law ground . . . independent of the federal question," a federal court may not review it unless the state law ground was not "adequate to support the judgment." *Coleman*, 501 U.S. at 729. The ground is "adequate" when "the rule upon which the state court relied is firmly established and regularly followed" in the State. *Downs*, 657 F.3d at 102 (internal quotation marks and citations omitted). The Second Circuit has "held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule." *Id.* at 104 (collecting cases). This Court, therefore, has no authority to grant habeas relief regarding summation comments to which no contemporaneous objection was made.[12]

The only arguably preserved claim is the prosecutor's statement that the jury should "do justice for Tony Walker":

---

[11] While counsel objected to the prosecutor's statement that the petitioner changed his story after "sitting there the whole trial" and hearing "what the medical examiner had to say," he objected to the phrase "sitting here the whole time," not that the prosecutor was saying that the petitioner tailored his testimony. (T. Tr. 1031.) The petitioner has not relied on that ground in challenging the summation before the Second Department or this Court.

[12] In certain "exceptional cases," the state court's "exorbitant application of a generally sound rule renders the state ground inadequate." *Downs*, 657 F.3d at 102 (citations omitted). This is not one of those cases, because the state court applied a well-settled rule to a routine situation—and the petitioner does not seek an exception. Nor does the petitioner articulate any cause for the default and prejudice that would allow this Court to look beyond the state court's procedural decision and assess the merits. *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (explaining that "[c]ause may be demonstrated with a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by state officials made compliance impracticable or that the procedural default is the result of ineffective assistance of counsel" (cleaned up)).

MS. BUCHTER: . . . Listen carefully to the law as the judge gives it to you and do justice.  Do justice for Tony Walker.  As I said in the opening, was he a perfect person? No, but who is? But do justice for Tony Walker because Tony Walker—

MR. HORN: Objection. Tony Walker has no interest in the outcome.

THE COURT: Overruled.

MS. BUCHTER: Tony Walker's own voice was silenced forever by this defendant, so you need to speak for him now.

MR. HORN: Objection.

THE COURT: You are going to do justice based on the evidence and the law that I give you, ladies and gentlemen. Thank you very much.

(T. Tr. 1051–52.)  The Second Department rejected the claim as "without merit."  (ECF No. 16-1 at 106.)

A prosecutor may not "attempt[] to appeal to the sympathy of the jury by asking the jury to fight for the victim during deliberations."  *People v. Nelson*, 68 A.D.3d 1252, 1255 (3d Dep't 2009) (cleaned up) (collecting cases); *see also People v. Redd*, 141 A.D.3d 546, 548 (2d Dep't 2016); *People v. Walters*, 251 A.D.2d 433, 434 (2d Dep't 1998).  New York courts also consider the "cumulative" effect of summation errors, even when defendants' challenges are "not preserved for appellate review" and when the trial court "sustain[s]" some of the objections.  *Redd*, 141 A.D.3d at 550–51; *see also Nelson*, 68 A.D.3d at 1255.

Nevertheless, the Second Department's decision was not "unreasonable" or "contrary to . . . Federal law."  *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C. § 2254(d)).  As the Supreme Court explained, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted).  Rather, the "relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation marks and citation omitted).  This is not such a case.  Immediately after the challenged comment, the trial

court instructed the jury "to do justice based on the evidence and the law that [the court] give[s]." (T. Tr. 1052.)  Additionally, "the strength of the People's case and the overwhelming proof of defendant's guilt," as discussed above, make it very unlikely that the jury would have found the petitioner not guilty but for the prosecutor's isolated remarks.  *Nelson*, 68 A.D.3d at 1255.

### IV.    The Petitioner's Sentence

Finally, the petitioner argues that his sentence is excessive and violates the Eighth Amendment's prohibition against cruel and unusual punishment because, given his age, it "amounts to life in prison without the possibility of parole."  (ECF No. 1 at 6 (capitalization altered).)

"It is well-established that when a sentence falls within the range prescribed by state law, the length of the sentence generally may not be raised as a basis for federal habeas relief."  *Silva v. Keyser*, 271 F. Supp. 3d 527, 545 (S.D.N.Y. 2017); *see also White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law.").  Because the petitioner's sentence falls within the New York's statutory range, this Court lacks authority to review his claim that his sentence is excessive.

The petitioner's claim that his sentence violates the Eighth Amendment is unexhausted, because he never requested relief under the Eighth Amendment in state court.  *Silva*, 271 F. Supp. 3d at 545 (rejecting a habeas petitioner's Eighth Amendment arguments because he did not challenge his sentence "in federal constitutional terms" before state courts); *Holliday v. New York*, No. 10-CV-0193, 2011 WL 2669615, at *2 (W.D.N.Y. July 7, 2011) (same).  When a habeas petition contains both exhausted and unexhausted claims, the court can dismiss the entire petition, delete the unexhausted claims and proceed with exhausted claims only, order a stay

until the petitioner exhausts the claim in state court or deny the unexhausted claim on the merits.

*See* 28 U.S.C. § 2254(b)(2); *Rose v. Lundy*, 455 U.S. 509, 522 (1982); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

In this case, the appropriate course is to reject the petitioner's claim on the merits.[13]  The petitioner cites no case—and the court is not aware of any—holding that an otherwise legal sentence is cruel and unusual solely because of a defendant's age or health.  To the contrary, the Sixth Circuit has held that the Eighth Amendment does not mandate "[i]ndividualized sentencing . . . in non-capital cases even where a term sentence effectively becomes a life sentence due to the personal characteristics of a defendant."  *Engle v. United States*, 26 F. App'x 394, 397 (6th Cir. 2001) (citing *Harmelin v. Michigan*, 501 U.S. 957, 996 (1991)); *see also Allen v. Ornoski*, 435 F.3d 946, 954 (9th Cir. 2006) (allowing execution of an elderly prisoner because the Supreme Court has never entertained an Eighth Amendment claim based on a prisoner's advance "age" or "physical infirmity"); *Holliday*, 2011 WL 2669615, at *2–4 (rejecting a habeas petitioner's argument that his advanced age and various illnesses meant "he effectively has been sentenced to death" in violation of the Eighth Amendment).

As the Supreme Court has explained, the Eighth Amendment prohibits sentences that are "grossly disproportionate to the severity of the crime."  *Rummel v. Estelle*, 445 U.S. 263, 271 (1980).  The Second Circuit has held that "federal courts should be reluctant to review legislatively mandated terms of imprisonment, and that successful challenges to the proportionality of particular sentences should be exceedingly rare."  *United States v. Santos*, 64 F.3d 41, 45 (2d Cir. 1995) (cleaned up), *vacated on other grounds*, 516 U.S. 1156 (1996); *see*

---

[13] A stay would not be appropriate here because the petitioner has not shown "good cause for [his] failure to exhaust" and his claim is not meritorious.  *Rhines*, 544 U.S. at 278 (setting out requirements for staying a habeas petition).  I also decline to dismiss the entire petition, because the AEDPA time limitations would preclude the petitioner from re-filing it at a later date.  *See* 28 U.S.C. § 2244(d)(1).

*also Silva*, 271 F. Supp. 3d at 545.  The petitioner's sentence of thirty-six years to life is not one of those "rare," "grossly disproportionate" cases.  His crime was brutal and unjustified.  Moreover, as Judge Holder explained, the petitioner committed it only four months after he was released from jail for killing another person.  (S. Tr. 11.)  His sentence is also in line with similar cases.  *See, e.g.*, *Boyce v. Bradt*, No. 09-CV-2832, 2012 WL 3764038, at *12 (E.D.N.Y. Aug. 29, 2012) (a sentence of twenty-five years to life for second degree murder was not disproportionate).

## CONCLUSION

For these reasons, the petition is denied in its entirety.  The case is dismissed.  A certificate of appealability will not be issued.  *See* 28 U.S.C. § 2553(c).

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
     February 1, 2023

24